## Patricia Donnelly's Case.

*Parent and child—Custody of child—Father and grandmother—Costs—Habeas corpus.*

1. A father who has remarried, is able to support his family comfortably, and is conducting himself properly, is entitled to the custody of a little girl, six years old, as against her grandmother, who has supported her in her family for four years; especially is this the case where the child expresses a strong inclination to live with her father and have the company of her younger brother.

2. In such case, where it appears that her father has abducted the child, he will be required to pay the costs of the *habeas corpus* proceedings brought by the grandmother.

Petition for writ of *habeas corpus*. C. P. Northumberland Co., Sept. T., 1921, No. 73.

*Voris Auten* and *W. B. Faust*, for relator.

*J. A. Welsh* and *S. A. Gribbin*, for respondent.

Moser, J., Dec. 27, 1921.—Joseph Donnelly, the respondent in this proceeding, was married to Sarah Bache, the daughter of the relator. On March 17, 1915, there was born to this union a female child, afterward named Patricia. During the month of August, 1917, Mrs. Donnelly died, leaving to survive her the said daughter Patricia, and a son named James, who was said to be about four years of age at the time of the hearing (May, 1921).

Soon after the death of the mother, Patricia was taken to the home of her maternal grandmother, the relator in this action, in the Borough of Mt. Carmel, where she remained for nearly four years. On Aug. 4, 1920, Joseph Donnelly remarried, and since that time he has been living with his second wife in the Borough of Shamokin. After this second marriage, Mr. Donnelly took James, the son, to his home in Shamokin, which, according to the testimony, is a comfortable and well-furnished abode. It appears from the testimony that during the fall of the year 1920 the respondent requested Mrs. Bache, the relator, to permit him to take Patricia to his home at Shamokin. When first requested to surrender the custody of the minor, the relator suggested

1 D. & C.

that the matter be deferred, but subsequently the request was refused; Patricia was not permitted to attend the public schools; her movements were somewhat restrained and to some extent she was guarded.

On May 27, 1921, the respondent went to Mt. Carmel with a taxi or motorcar, picked Patricia up while she was playing in the neigborhood of relator's home, put her into the car against her will and drove her to his home in Shamokin, where she has since remained as a member of his family.

After the final hearing, in view of the manner in which the minor was taken from the relator, we were rather inclined to remand her to her grandmother, thus placing matters in *statu quo* until there could be a final determination of the rights of the respective parties. To this end we talked to Patricia when no one was present, and intimated that she had better return to her grandmother for at least a few weeks. She was decidedly opposed to this suggestion, declaring emphatically that she wanted to remain with her father and brother. When we hinted that she might be required to return at least temporarily to her grandmother, she became excited and clearly indicated that if she was to be returned to the relator, it could only be accomplished by compulsion or the use of force. While the child was little more than six years old at the time of the hearing, it must be conceded that she was bright and intelligent for one of her years; she seemed to comprehend quite clearly just what was being done and what the parties were attempting to accomplish.

We hesitated to compel this little girl to leave her father and little brother and decided to permit matters to continue as they were for a time, so that we might await developments. Both parties to the controversy are comfortably situated, are financially able to furnish the girl a good home and provide her with an ordinary education. From reliable sources we learn that at the date this is written the young lady is apparently happy and contented with her father and stepmother, and that she is very much attached to her little brother.

In this case it was strongly intimated that testimony would be introduced to show that the respondent indulged in bad habits; that he made a practice of gambling and spent many nights away from his home; that he was not a fit person to have the custody of the minor child in question and be responsible for her bringing up. There was no allegation that he ever used intoxicants. There was some testimony to the effect that he gambled at times and remained away from his home at night; but from the evidence of all the witnesses interrogated concerning his private life since his last marriage, we must conclude that since he has been living at Shamokin with his present wife, he has been steady, industrious and prosperous; that he has provided a good home for his children and that they have been fortunate in the stepmother selected for them.

In determining the right of custody of an infant, the three interests involved are those of the parents, of the State and of the infant, and of these the latter is the more important and controlling: Com. ex rel. McDonald *v.* McDonald, 20 Dist. R. 1071; Com. *v.* Hart, 8 W. N. C. 156. In the case here under consideration we think that either the relator or the respondent would be solicitous of the welfare of the infant and jealously promote her best interests. The grandmother having had the custody of Patricia for nearly four years, and she being an attractive child, it inevitably follows that the grandmother became deeply attached to the little girl and suffered many pangs of sorrow since she has been taken away. Under all the circumstances, in attempting to arrive at a conclusion in this case, we may well ponder over the thought expressed by Mr. Justice Fell in the case of Com. *v.* Blatt, 165 Pa. 213, where he uses the following language: "The subject is one of the most difficult and

delicate upon which a court is called to act." In that very case, however, the court proceeds to say: "The legal right of the parent to the custody, care and companionship of his children is not to be interfered with except for the most substantial reasons affecting their welfare. The hasty disposition of such a case, unless it be very clear, is likely to result in great injustice to the parent or ultimate injury to the child." In Com. *v.* Hogan, 14 Dist. R. 196, it is said by Judge Criswell: "The surviving parent of a child is its natural guardian and protector, and his right to its custody should not be ignored except for cause. Poverty, in itself, is no sufficient cause, unless it be such as to entail real hardships upon and neglect of the child. The cause which will justify disregard of the natural rights of a parent must ordinarily be something in the nature of a fault or neglect, intentional or otherwise, injuriously affecting the child in his custody, and from which, for this reason, the best interests of the child, as well as of the State and community at large, require that the child should be protected."

While we have the greatest sympathy for the relator and are mindful of her rights, after having taken care of the child for about four years, yet we think the above quoted legal principles laid down by the courts, together with the fact that, in living with her father and his family, Patricia will have an opportunity to grow up with her brother, to associate with him, and in all probability become attached to him as a sister should, have turned the scales in favor of the father. The writ is, therefore, discharged.

The respondent, in his testimony, signified a willingness to make an adjustment with the relator for the support and clothing given the child while in her custody; this, we think, he ought to do without delay. Under all the circumstances, in view of the fact that respondent took the law in his own hands and removed the child forcibly, we hereby direct that he pay the costs of this proceeding.

From C. M. Clement, Sunbury, Pa.